**E-FILED**
Tuesday, 22 April, 2008  04:00:20 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MARY A. GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-3273 |
| | ) | |
| ILLINOIS STATE POLICE; | ) | |
| ILLINOIS STATE POLICE | ) | |
| ACADEMY COMMANDER CARL J. | ) | |
| WEITZEL; STATE TROOPERS ERIC | ) | |
| HELTON, MICHAEL SEVERINO, | ) | |
| BRIAN WILHAM, and SARA | ) | |
| WILLMAN; and STATE POLICE | ) | |
| CADETS BONITA PALMER and | ) | |
| STACIE NEISLER, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

*Pro se* plaintiff Mary Garcia's confusing narratives, poorly argued claims, refusal to abide by Local Rules, failure to cite legal precedent, and general unwillingness to pursue any significant discovery, have forced this Court and the Attorney General of Illinois to expend significant resources

in considering a plethora of frivolous claims.

After investing an unwarranted amount of time in this case, the Court now grants summary judgment for all defendants [d/e 58, 59].[1]

## BACKGROUND

### A.    Garcia's Filings

Before delving into the undisputed facts, several issues must be addressed.  First, Plaintiff Mary Garcia's ("Garcia") responses, which fail to cite specific portions of the record, fail to comply with the Local Rules.  *See, e.g.,* CDIL-LR 7.1(D)(2)(b).  Nevertheless, in the interest of completeness and because of Garcia's *pro se* status, this Court will consider her responses as presented in her January 5, 2008 filings [d/e 137, 140].[2]  Her February and March 2008 submissions, however, were filed several months late and

---

[1]A myriad of related motions taken with the case are variously granted or denied.

[2]The Court will also consider Garcia's prior responses [d/e 70, 125]. Accordingly, Defendants' motion to strike [d/e 114] portions of Garcia's response [d/e 70] is denied, in part because Garcia's disjointed narrative appears to be making legal arguments in addition to factual assertions. This Court, however, will strike particular non-complying factual claims where appropriate.

are disregarded with respect to the summary judgment motions.[3]

Second, while Garcia denies nearly all of Defendants' factual assertions, the bulk of these denials fail to dispute the underlying facts alleged. For example, most denials stem from Garcia's desire for more evidence from the Defendants, her unsupported accusations that Defendants are withholding favorable evidence, and her speculation that all the evidence against her has been forged. (*See, e.g.,* "Motion for Affirmative Defenses" [d/e 137] ¶¶ 10, 11, 13, 22-25, 27-35, 51-52, 54, 61-62, 64, 67, 69, 73, 75.) Other responses contain broad generalizations, jeremiads against the ISP, or legal conclusions. (*See, e.g., id.* ¶¶ 13-15, 18-19, 35, 64-65, 67-69). In some cases Garcia relies on wholly inapposite facts to support her point or baldly denies relevance; in other instances, her arguments collapse into incoherence. (*See, e.g., id.* ¶¶ 13, 15, 18, 21, 28, 36-42, 45-49, 55). Denials falling into any of these categories will be ignored. This Court will find the existence of a factual dispute only where Garcia offers a conflicting version of events that is supported by the record.

---

[3]Consistent with this, the Court grants Defendants' motion to strike [d/e 143] Garcia's February 27, 2008, affidavit [d/e 142].

Finally, Garcia's additional factual allegations utterly fail to conform to any aspect of Local Rule 7.1(D)(2)(b)(4).  Although no good cause justifies this deficiency, *see* CDIL-LR 7.1(D)(6), the Court will nevertheless set out Garcia's side of the story.

## B.    Undisputed Facts

Garcia, a woman of Hispanic origin,[4] was employed by the Illinois State Police ("ISP") as a cadet from January 4, 2004, through January 14, 2004.  (Defs.'[5] Mem. in Supp. of Mot. for Summ. J. [d/e 61], Undisputed Facts ¶¶ 1, 3.)  Upon arriving at the ISP Academy, Garcia was assigned to Squad 4 of Class 107.  (Undisputed Facts ¶¶ 2, 4.)  Defendant Eric Helton ("Helton") was the Class Coordinator for Class 107.  Defendant Michael Severino ("Severino") served as the Class Counselor for Squad 4, and Defendant Sara Willman Cox ("Cox") was assigned to the same role for Squad 3.  (Undisputed Facts ¶¶ 4-6.)

---

[4]Garcia also believes she has Native American ancestry.

[5]The individual defendants' Memorandum in Support of Motion for Summary Judgment will be referred to as "Defs.' Mem. in Supp. of Mot. for Summ. J."  All of the undisputed facts are taken from this document [d/e 61] unless otherwise noted.  The ISP's Memorandum in Support [d/e 60] contains almost all of the same facts verbatim.

During the first day, Helton discussed portions of the Cadet Code of Conduct with the entire class, including sections demanding cadets be truthful in word and practice.  (Undisputed Facts ¶¶ 13-14.)  Another section of the Code explained that "Complaints regarding Academy facilities or services will be made <u>exclusively</u> to the Cadet's Counselor, Class Coordinator, or the Policing Foundation Section Supervisor."  (Undisputed Facts ¶ 16, Ex. 6 at 15.)[6]

Within hours of starting her new job, Garcia racked up a slew of disciplinary infractions.   First, Garcia repeatedly failed to follow instructions to stand with her toes behind a line.  (Undisputed Facts ¶ 11.) A second, more serious violation soon followed.  Helton had ordered the cadets to call a friend or family member to inform them of their safe arrival at the Academy.  (Undisputed Facts ¶ 20.)  Following up on this order, Cox

---

[6]Garcia denies these facts on the basis that Defendants erroneously put the date as 2007 rather than 2004 and because, in her opinion, the ISP does not follow this practice.  ("Motion for Affirmative Defenses" [d/e 137] ¶ 12.)  She does not, however, deny that Helton read these portions of the Cadet Guide to the class in 2004.  As such, the facts are undisputed.

asked whether anyone in Squad 4 still needed to call home.[7]  (Undisputed

Facts ¶¶ 21-22.)  Garcia, a member of Squad 4, did not raise her hand.

(Undisputed Facts ¶ 23.)  Cox repeated the question to Squad 3 and, after

several cadets raised their hands, Garcia did as well.  (Undisputed Facts ¶¶

24-25.)  These Cadets, including Garcia, were dismissed so that they could

make their calls.  (Undisputed Facts ¶ 27.)  Upon their return, Cox again

asked whether any cadets had failed to contact a family or friend for any

reason, and no one responded.    (Undisputed Facts ¶¶ 28-29.)  Later,

however, Garcia variously told Cox that she had tried to call home but no

one answered, and that she could not find her phone and therefore had

never made a call.  (Undisputed Facts ¶ 30, 33.)[8]  Deeming Garcia's

responses untruthful, Cox reported Garcia's behavior to Helton and Section

---

[7]Garcia appears to dispute whether Cox made this statement or
another individual, but does not otherwise suggest this did not occur.
("Motion for Affirmative Defenses" [d/e 137] ¶ 22.)

[8]Garcia argues that the Defendants' evidence is fabricated and that
she was never punished with regard to this incident.  Nevertheless, aside
from stating that Cox did not ask her who she called and that she
eventually called home that night, Garcia does not present a different
version of the incident.  (Garcia Aff. at 1; "Motion for Affirmative
Defenses" [d/e 137] ¶¶ 32-34.)

Supervisor Chris Tracey.  (Undisputed Facts ¶ 34.)

Garcia's woes continued the next day.  On January 5, 2004, Helton received reports that Garcia disregarded the chain of command and showed disrespect to Academy staff by complaining about greasy cafeteria food to a chaplain and cafeteria workers.  A second report to Helton complained of Garcia's failure to exhibit teamwork when she spilled her milk and failed to help a cadet clean it up.  Finally, Garcia failed to give an appropriate greeting to a superior three separate times and was ordered to write a memo on the subject.  (Undisputed Facts ¶¶ 35-42.)

On January 6, 2004, Garcia again failed to abide by the chain of command and reported an injury directly to Helton.  Garcia was also cited for exerting little effort in her classes and for committing other minor infractions.   Further, Helton received reports that Garcia again inappropriately addressed cafeteria staff and that she alone of all the cadets failed to attend a weight room training session.  Finally, Plaintiff failed to turn in a memo, failed to follow directions relating to her clothing, failed to attend a meeting with Severino, and failed to follow lights-out procedure. (Undisputed Facts ¶¶ 43-54.)

On January 7, 2004, Garcia reported communications problems with Cadet Gureski, but did not mention any discriminatory conduct. Indeed, in one of her memos, Garcia attributed her problems with Gureski to a sit-up test that Gureski had failed because of Garcia. (Undisputed Facts ¶¶ 57-58; Ex. 14.) Garcia filed no reports with the ISP's EEO office,[9] nor did Severino, Garcia's Class Counselor, ever receive any such complaints from her. (Undisputed Facts ¶¶ 62-63.)

On January 9, 2004, Master Sergeant Scott Abbott first recommended to Academy Commander Carl J. Weitzel ("Weitzel") that Garcia's employment be terminated for her inability to follow directions, be forthright, or accept responsibility. (Undisputed Facts ¶ 64.) On January 14, 2004, Weitzel recommended that Director Trent fire Garcia for untruthfulness and insubordination. (Undisputed Facts ¶ 65.) Garcia was terminated that day. (Undisputed Facts ¶ 66.)

## C.  Garcia's Affidavit

Garcia, in her affidavit, adds a number of additional disputed

---

[9]Garcia claims that she wished to see an EEO Counselor but Helton ignored her request for such a meeting. (Garcia Aff. at 4.)

allegations, which this Court takes as true for summary judgment purposes.[10]  First, Garcia witnessed several instances of discrimination.  She claims that during check-in unnamed instructors singled out Cadet Palmer, an African American, by noting that she was slow in line and making "a reference to Ms. Palmer's 'kind.'"  (Garcia Aff. at 1.)  Garcia avers that she considered the comments racist.  (*Id.*)  Garcia also heard fellow Cadets Gureski and Neisler refer to Cadet Navarro as "Navaho [sic]" in reference to her Native American ancestry.  (*Id.*)  Garcia, believing herself to be Native American, found the statements offensive.  (*Id.*)

Further, Garcia describes several instances of discrimination directed at her from instructors.  First, Garcia claims that Helton ridiculed her for her cheeseburger complaints to the chaplain and staff, and that he punished Garcia's entire class with a drill.  (*Id.* at 1-2.)  Garcia further alleges that Helton discriminated against her by angrily asking her, in front

---

[10]Garcia's affidavit, which often degenerates into a rambling diatribe against the ISP, contains numerous other allegations ranging from ISP instructors disliking military personnel to hyperbolic and fanciful claims of hazing and torture.  This Court will only recount claims pertinent to the legal issues at hand.

of the class, whether she was Hispanic or Indian. (*Id.* at 10-11.) Finally, Garcia claims that Cox told her that the academy was not right for her and that she was "not the right profile." (*Id.* at 5.)

In addition to this alleged discrimination from the instructors, Garcia also asserts that her fellow cadets discriminated against her. Specifically, Garcia avers that Cadets Gureski and Neisler made a number of negative comments about Hispanics and Native Americans, calling them "trouble-makers," "stupid," "ready to fight," and "loud." She further alleges that Gureski and Neisler engaged in a conspiracy to turn other cadets against her. Garcia, however, did not report any such discrimination, despite reporting complaints about Gureski, Palmer, and other cadets on a variety of different grounds.[11] She claims that she wanted to report this behavior

---

[11]Garcia claims she did complain about this behavior. First, she states that she reported Gureski's behavior in the memos discussed above. The Defendants, however, produced Garcia's handwritten, signed memos and none contain such allegations. (*See* Def.'s Memo in Support of Mot. for Summ. J., Ex. 14-15.) In fact, those memos support an entirely different theory for Garcia's difficulties: Gureski was upset because Garcia caused her to fail a sit-up test. (*Id.*) Since Garcia's claims come solely from her self-serving affidavit and since those claims are not supported by the record (indeed, they are contradicted by it), Garcia's testimony about the contents of the memos is disregarded. *See*

(continued...)

to an EEO Counselor, but was unable to because Helton did not respond to her request to set up such a meeting.  (*Id.* at 4.)

## ANALYSIS

Plaintiff, formerly assisted by counsel, asserts a multiplicity of claims. Against the ISP she brings claims under Title VII for (1) sex, race, and national origin discrimination, (2) religious discrimination, (3) disparate impact, (4) hostile environment, and (5) retaliation.  Against the individual defendants, Garcia asserts claims of (1) First Amendment retaliation, (2) race and national origin discrimination, (3) violation of liberty interests, (4) tortious interference with prospective employment, and (5) civil battery.

---

[11](...continued)
*Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (quoting *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993)) ("[S]elf-serving statements contained in an affidavit will not defeat a motion for summary judgment *when those statements are 'without factual support in the record.'*" (emphasis in original)).  Second, Garcia, in her affidavit, claims that she tried to report Gureski and others to another unnamed officer as well.  (Garcia Aff. at 4.)  During her deposition, however, Garcia was asked to discuss all of her attempts to report Gureski.  (Individual Defs.' Reply, Ex. 41.)  She did not mention this attempt and provides no reason for her sudden recollection of another reporting attempt.  (*Id.*)  Therefore, this statement is disregarded.  *See Patterson v. Chi. Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998) (quoting *Unterreiner v. Volkswagen of Am. Inc.*, 8 F.3d 1206, 1210 (7th Cir. 1993)).

Defendants seek summary judgment on all these claims. Before addressing these claims, however, this Court considers Garcia's motion to strike Defendants' summary judgment motions and reopen discovery.[12]

## A.    Garcia's Motion to Strike Filings and Reopen Discovery

Over three months after the summary judgment motions were fully briefed, Garcia moved this court to reopen discovery.[13] Although leniency is required where plaintiffs proceed *pro se*, at some point the kid gloves must come off. Garcia has already been granted extraordinary latitude with respect to discovery, including four extensions of time.[14] In granting the

---

[12]The parties have also filed two other minor motions. First, Plaintiff filed a document labeled as a "Motion for Affirmative Defenses" [d/e 137]. This document, however, is not a motion but a response to Defendants' statements of material facts. Therefore, the "motion" is denied. Defendants also seek to strike their own accidental filing [d/e 119]. That motion is granted. Accordingly, the clerk is directed to strike [d/e 116].

[13]Defendants also move to strike Garcia's Reply and supporting documents [d/e 168-172], all of which relate to her motion to reopen discovery. The Central District's Local Rules forbid such replies. CDIL-LR 7.1(B)(3). Therefore, Defendants' motion [d/e 173] is granted.

[14]This Court, in a September 21, 2006, scheduling order [d/e 37], directed that discovery be completed by April 30, 2007. On March 23, 2007, Garcia filed a motion to extend the time for completion of

(continued...)

final extension, the Court noted that it did so only because of Garcia's *pro se* status and admonished Garcia that no further extensions would be forthcoming.

Nothing in the present motion, which relies on magazine articles and unsubstantiated claims of wide-spread discovery abuses, changes this Court's prior assessment.   Garcia had ample opportunity to pursue discovery and has offered no evidence to support her claims of misconduct. Indeed, this Court rejected these very same allegations in the context of Garcia's motion for sanctions.   (*See* Pl.'s Mot. for Sanctions [d/e 120]). Granting the motion to reopen discovery at this late hour would not only contravene this Court's prior warnings and rulings, it would also threaten to transform a needlessly long case into an interminable one.   Therefore, Garcia's motion to strike the summary judgment motions and reopen discovery is denied.

---

[14](...continued)
discovery [d/e 43], which this court granted, moving the deadline to June 1, 2007.  On May 10, 2007, Garcia sought a second extension [d/e 45, 46], which this Court again granted, extending the deadline to June 25, 2007.  A third motion [d/e 50] followed on June 18, 2007, and the date was moved to July 25, 2007.  On July 26, 2007, Garcia filed her fourth and final motion for an extension of time [d/e 52].

### B.  Defendants' Motions for Summary Judgment

### 1.  Standards

"Summary judgment is proper when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Henry v. Jones*, 507 F.3d 558, 563 (7th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)).  "Only disputes as to facts which are material, i.e., 'facts that might affect the outcome of the suit under the governing law,' and genuine, i.e., disputes for which 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' will preclude summary judgment." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir.), *cert. denied*, 128 S. Ct. 654, 169 L. Ed. 2d 510 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  All facts and reasonable inferences are construed in favor of the nonmoving party, but such inferences must be supported by more than mere speculation or conjecture.  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citations omitted).

2.    **Discrimination Claims against ISP and Individual Defendants: Race, Gender, and National Origin**

Garcia asserts race and national origin[15] discrimination claims against the ISP based on Title VII and equal protection violations on the same grounds against individual defendants Weitzel, Helton, Severino, Wilham, and Cox under 42 U.S.C. §§ 1981 and 1983.[16]  The Defendants move for summary judgment on these claims.  Discrimination claims may be brought under either a direct method, involving direct or circumstantial evidence, or by relying on the indirect, burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668

---

[15]Sex discrimination was also alleged against the ISP.  Aside from statements in her complaint, Garcia has offered no evidence on this score.

[16]Because these claims are analyzed under the same general framework, they are addressed together.  *See, e.g., Benders v. Bellows & Bellows*, 515 F.3d 757, 768 n.7 (7th Cir. 2008) (citing *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003)) ("The same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection claims."); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) (collecting cases and explaining that the Seventh Circuit has generally "applied the same prima facie requirements to discrimination claims brought under Title VII and § 1981"); *Malacara v. City of Madison*, 224 F.3d 727, 728-29 (7th Cir. 2000) (analyzing Title VII, § 1983, and § 1981 claims under the same standards).

(1973).  *See Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 681 (7th Cir.

2007) (citing *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736-37 (7th

Cir. 2006)).  If a plaintiff fails to set forth a prima facie case, summary

judgment in favor of a defendant is proper.  *Henry*, 507 F.3d at 564 (citing

*Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)).  If,

however, the plaintiff meets her initial burden, the defendant must present

a legitimate, nondiscriminatory reason for the adverse employment action.

*Id.* (citing *Burks*, 464 F.3d at 751).  The plaintiff bears the burden of

showing that the asserted reasons were merely pretextual.  *Id.* (citing *Burks*,

464 F.3d at 751).

In this case, Garcia has not offered direct or circumstantial evidence

that a decisionmaker acted with discriminatory animus.[17]  Thus, the issue

---

[17]Only two pieces of evidence would conceivably fall into this category.  First, Helton asked Garcia whether she was Hispanic or "Indian" shortly before her termination.  Helton, however, was not a decisionmaker and, in any event, the undisputed evidence shows that the termination recommendation occurred some five days prior to this incident.  Second, Cox made a statement about Garcia not being the right "profile."  Again, however, Cox was not a decisionmaker.  Further, where the nonmovant has failed to provide any background evidence relating to the conversation, the bare use of the word "profile" does not transform a race-neutral statement into a racially charged one.  *See*

(continued...)

is whether she has made out a prima facie case under the indirect method. To state a claim under the *McDonnell Douglas* framework, Garcia must show (1) that she is a member of a protected class; (2) her performance met legitimate expectations, (3) despite this performance, she was subjected to an adverse employment action; and (4) the defendant treated similarly situated individuals outside of the protected class more favorably. *See Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008).

In this case, the undisputed record shows that Garcia committed numerous infractions within the first few days of her training, including making disrespectful comments to Academy staff, failing to follow a variety of procedures, and being less than truthful about having made a phone call. Given all of these shortcomings, Garcia cannot claim that she was meeting the ISP's legitimate expectations.

Nor has Garcia, despite her protestations about being singled out,

---

[17](...continued)
*Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006). Thus, this evidence does not support the inference that Garcia was terminated for discriminatory reasons.

identified any similarly situated individuals who received more favorable treatment.  Indeed, the record shows that a number of cadets of different races were terminated for infractions similar to Garcia's.  (Undisputed Facts ¶¶ 70-75.)  For example, a white male cadet was terminated for saying he did not have a highlighter in his pocket when, in fact, he did.  (Undisputed Facts ¶ 74.)  Therefore, Garcia has failed to set out a prima facie case of discrimination based on race, sex, or national origin,[18] and Defendants are entitled to summary judgment.

### 3.     Claims against ISP

#### a.     Disparate Impact Claim

Garcia alleges a disparate impact claim based on a variety of ISP practices.  Such claims, however, require statistical evidence showing that the complained of practice operates to exclude a protected group.  *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005) (citations omitted).  Since Garcia offers no such evidence, Defendants are entitled to summary

---

[18]  Further, even if a prima facie could be made out, Garcia has not shown that the ISP's justification for her termination (her numerous infractions) was actually a pretext.

18

judgment on this claim.

### b.    Hostile Environment Claim

Defendants next seek summary judgment on Garcia's hostile environment claims.  A plaintiff demonstrates a hostile environment by showing that "1) [s]he was subject to unwelcome harassment; 2) the harassment was based on [her] race [or other protected characteristic]; 3) the harassment was severe and pervasive so as to alter the conditions of the employee's environment and create a hostile and abusive working environment; and 4) there is a basis for employer liability." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000) (citation omitted).  Garcia's claim is based on her overhearing comments about Palmer and Navarro (which she considers racist) and Gureski and Neisler's negative remarks about Hispanics.  When a claim is based on harassment by coworkers, as it is here,[19] the employer is liable "only when the employee

---

[19]Garcia did allege that unidentified instructors, rather than fellow cadets, made the two negative comments about Palmer, but she has not shown that either comment related to race-based harassment.  First, the comment about Palmer being slow in line has no relation to race, except for Garcia's speculation as to the instructor's motivation for making it.  Further, Garcia has provided no context for the statement about

(continued...)

shows that his employer has been negligent either in discovering or remedying the harassment." *Id.* (citations and internal quotations omitted). Garcia, who did complain about the conduct of Gureski and other cadets, failed to mention any such discrimination based on race, national origin, or sex. Therefore, even assuming that Garcia's evidence is otherwise sufficient, her lack of evidence supporting employer liability entitles the ISP to summary judgment.[20]

---

[19](...continued)
Palmer's "kind," except for the use of the word itself. While a benign word, even when standing alone, may carry a racially-charged meaning based on the surrounding circumstances, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456, 126 S. Ct. 1195, 163 L. Ed. 2d 1053 (2006) (finding that use of facially neutral term "boy" could show racial animus based on circumstances), the nonmovant must at least describe those circumstances, *Twymon*, 462 F.3d at 934 (noting that "[f]acially race-neutral statements, without more, do not demonstrate racial animus" and refusing to "extrapolate racial animus" from such statements where the nonmovant failed to provide "any factual support or context for such speculation"). In this case, Garcia did not give any significant context to the statement about Palmer. Assigning a racially derogatory meaning to the bare phrase "kind" would be based on nothing but speculation. Therefore, the evidence relating to instructor harassment, even when construed in Garcia's favor, is insufficient to show any harassment based on race. As such, the Court will merely address harassment from Garcia's co-workers.

[20]Although Garcia's hostile environment claim does not mention

(continued...)

c.     Title VII Retaliation Claim

Garcia alleges that the ISP retaliated against her for making a number of complaints and for allegedly requesting to speak with an EEO counselor. Retaliation claims, like discrimination claims, may be brought under direct or indirect methods.  *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007).  As discussed in the discrimination context, Garcia cannot make out an indirect claim.  Nor does her claim fare any better under the direct method.  For a direct method claim to survive summary judgment, a plaintiff must present evidence that: "(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two."  *Benders v. Bellows* & *Bellows*, 515 F.3d 757, 764 (7th Cir. 2008) (citing *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004)).  In this case, no evidence shows that Abbot or Weitzel, the original decisionmakers, had any knowledge of these

---

[20](...continued)
Cox's use of the word "profile" or Helton's question about her ethnicity, neither statement changes the analysis.  First, as discussed above, no evidence indicates that "profile" was used with racial animus.  Second, Helton's single question about Garcia's ethnicity cannot be "severe and pervasive."

complaints or the attempt to contact an EEO Counselor. Thus, even assuming that other elements are met, Garcia has not established a causal connection. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006) (quoting *Luckie*, 389 F.3d at 715) ("It is not sufficient that an employer could or even should have known about an employee's complaint; the employer must have had actual knowledge of the complaints for its decisions to be retaliatory." (internal quotations and alterations omitted)). Summary judgment is granted on this claim.

### d.    Title VII Religious Discrimination Claim

Next, Defendants move for summary judgment on Garcia's religious discrimination claims. Garcia claims that she was ridiculed for complaining to a chaplain about greasy cheeseburgers served by the Academy. Further, she claims that her entire class was forced to perform knee drops because of her policy violation. This does not establish a basis for a religious discrimination claim. First, the undisputed evidence shows that Garcia was reprimanded for violating ISP policy by complaining to both staff and the chaplain about the food, not because of her religious beliefs or actions. Second, being lectured and forced to do a class exercise does not qualify as

an adverse employment action.  *See, e.g., Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 465-66 (7th Cir. 2002).  To the extent Garcia alleges that this incident impacted her eventual termination, she has presented no evidence that any decisionmaker knew of her religious beliefs or her conversation with the chaplain.  As such, summary judgment must be granted.

### 4.    Claims against Individual Defendants

Garcia also filed claims against several individual defendants. Specifically, she alleges that (1) Weitzel, Helton, Severino, Brian Wilham ("Wilham"), and Cox retaliated against her in violation of her First Amendment rights, (2) Weitzel, Helton, Severino, and Wilham violated her liberty interest, (3) Neisler tortiously interfered with Garcia's prospective economic advantage, and (4) Palmer committed civil battery against her. The individual defendants move for summary judgment on these claims.[21]

### a.    First Amendment Claims

Garcia alleges that Weitzel, Helton, Severino, Wilham, and Cox

---

[21]Defendants raise a number of immunity defenses.  While the government's thorough briefing on these points is commendable, this Court will nevertheless jump right to the merits because of the blatant weaknesses in Garcia's claims.

retaliated against her because she had a casual conversation with the chaplain and complained about various rules violations.[22]  To prevail on a retaliation claim under § 1983, a plaintiff must prove "(1) that [she] [was] engaged in constitutionally protected speech; (2) that public officials took adverse actions against [her]; and (3) that the adverse actions were motivated at least in part as a response to the plaintiff['s] protected speech." *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008) (citing *Mosley v. Bd. of Educ. of Chi.*, 434 F.3d 527, 533 (7th Cir. 2006)).

Garcia fails to establish the first element, because neither of her statements qualify as protected speech.  First, Garcia's casual conversation with the chaplain about cheeseburgers is a textbook example of speech on a matter of personal interest.  As such, it does not merit First Amendment protection.  *See Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) ("[W]hen a public employee speaks . . . as an

---

[22]She also points to her claim that she reported discriminatory actions of other cadets.  This assertion, however, was struck as contrary to Garcia's deposition testimony.  Even if it were not, however, it is undisputed that a cadet would have a duty to make such a report.  Therefore, this would not be protected speech. *See Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).

employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."). Second, it is undisputed that Garcia's report on Palmer was made pursuant to her official duties. Indeed, Garcia explicitly states this in the report itself: "I . . . see no option in reporting a dorm violation; otherwise I would be at fault for hiding this violation." (Def.'s Memo in Supp. of Mot. for Summ. J., Ex. 16.) "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). Thus, no First Amendment protection applies, and Defendants are entitled to summary judgment on this claim.

### b.    Liberty Interest Claims

In Garcia's final federal claim, she asserts a deprivation of her liberty interest, specifically the right to pursue an occupation of her choice. To succeed on this claim, Garcia must show that "(1) [she] was stigmatized by

the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) [she] suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001). Garcia has not provided any evidence relating to any of these elements. As such, summary judgment is warranted.

### c.    Tortious Interference

Next, Defendants move for summary judgment on Garcia's tortious interference with a prospective economic advantage claim. For such a claim to survive summary judgment, a plaintiff must offer evidence showing "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07, 217 Ill. Dec. 720, 667 N.E.2d 1296 (1996) (citing *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511, 154 Ill. Dec. 649, 568 N.E.2d 870 (1991)). Garcia's evidence on this count consists of nothing more than a

general allegation that Neisler conferred with other cadets on how to get Garcia dropped from the Academy and then spread rumors about her. Summary judgment, however, requires more than vague unsupported speculation and generalized allegations. *See, e.g., Stein v. Ashcroft*, 284 F.3d 721, 726 (7th Cir. 2002) ("Bald and self-serving assertions in affidavits, unsubstantiated by any documentation or other testimony, are not sufficient to create a material issue of fact . . . ."). Defendants are entitled to summary judgment.

### d.    Civil Battery

Finally, in an unrelated incident occurring at the Academy, Garcia alleges that Cadet Palmer committed civil battery. Civil battery is defined under Illinois law as "'the wilful touching of the person of another or a successful attempt to commit violence on the person of another.'" *Britamco Underwriters, Inc. v. J.O.C. Enters., Inc.*, 252 Ill. App. 3d 96, 101, 191 Ill. Dec. 446, 623 N.E.2d 1036 (1993) (quoting *Parrish v. Donahue*, 110 Ill. App. 3d 1081, 1083, 66 Ill. Dec. 860, 443 N.E.2d 786 (1982)).

Garcia claims battery based on allegations that Palmer slammed a

drawer on her finger and then, for no apparent reason, punched her.[23]  Two witnesses tell a far different story, as does Palmer, and no one mentions any punches or pushing.  An internal investigation by the ISP found Garcia's version of events incredible.  Garcia herself admits that she did not see a blow but suspects Palmer inflicted the bruise on her shoulder, and also believes that Palmer knew her finger was in the drawer that she closed.

Even assuming that a reasonable jury could find for Garcia based on her minimal and heavily contradicted evidence, Garcia's factual version of the incident with Palmer was not presented in accordance with Local Rule 7.1(D)(2)(b)(4).  Although this Court has generally addressed Garcia's additional factual claims despite her clear disregard for local rules, it did so solely in the interest of completeness (i.e., whether the facts were accepted or not, Garcia would not be entitled to summary judgment).  However, now that the issue is squarely before the Court, it will not hesitate to strike Garcia's additional assertions regarding the incident with Palmer.  Even *pro*

---

[23]This alleged "punch" began life as a "push" but, like many of Garcia's claims, mutated into a more serious offense with the passage of time.

*se* parties must comply with local rules in the absence of good cause, CDIL-LR 7.1(D)(6), and Garcia's repeated failure to comply with this Court's rules precludes a good cause finding. Further, application of these rules to bar a claim is especially important in this case, where the plaintiff has conducted little relevant discovery; flooded the docket with improper filings that run the gamut from irrelevant to incoherent; and used her case as an extended opportunity for smearing the Defendants with invective tirades. As such, this Court has no qualms about strictly adhering to the dictates of Local Rule 7.1(D)(2)(b)(4) and barring Garcia's additional allegations. Therefore, the Court disregards Garcia's factual averments relating to the incident with Palmer and, having done so, grants summary judgment.

## CONCLUSION

For the reasons stated above, Defendants motions for summary judgment [d/e 58, 59] are GRANTED. Garcia's "Motion for Affirmative Defenses" [d/e 137] is DENIED as is her motion to strike and reopen discovery [d/e 146]. Defendants' motion to strike Garcia's response [d/e 114] is DENIED, but their other motions to strike [d/e 119, 143, 173] are GRANTED.

IT IS SO ORDERED.

ENTERED:                                April 18, 2008

FOR THE COURT:                          /s Judge Richard Mills
                                        United States District Judge